Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. Hello Mr. Calandra and Mr. Bissup. I'm Judge Dennis and I'm welcoming you to the Fifth Circuit together with Judge Englehart and Judge Hicks. We're your panel for this first case to be argued this afternoon. Apollo E. Callinan versus Lexicon Pharmaceuticals. So we'll start off with Mr. Calandra. Good afternoon your honors and may it please the court. Brian Calandra, Pomerantz LLP on behalf of the plaintiff appellants Paul Callinan and George Rivera. The amended complaint in this case states claims against the defendants for securities fraud because it alleges that defendants knew about the FDA's warning regarding the composite endpoint that they were using in their phase three trials as well as that they knew that the incidence of DKA in those trials was more severe, harder to diagnose, and more difficult to manage. And finally they knew that their risk management protocol had not had any effect on the rate of DKA in those trials. Now in spite of knowing these facts they nevertheless went out throughout the period and represented to investors that the composite made representations about the composite endpoint that they characterized the DKA as slight, low, and manageable and they set they created the impression in investors that they had a risk management program or risk management protocols that would affect the rate of DKA when they didn't. And they knew that or at least were reckless as to the falsity of the statements they were making because they knew facts contrary to these statements. Finally these statements caused defendants losses because they were revealed at the advisory committee meeting and the price fell thereafter and additional information leaked out over the course of subsequent disclosures regarding the FDA's denial of Sutagliflozin's NDA as well as Sanofi's termination of the agreement. So first the district court held that their statements regarding the composite endpoint were false only because plaintiffs were unable to allege a specific day, date, and communication that contained the warning. And it's opposition that that was improper because that's actually demanding evidence when what the district court plead with particularity what we need to assert is something beyond the speculative level that this warning was made before defendants made their statements. And at a minimum we have alleged that because in June 2018 defendants make statements about the composite endpoint after telling investors that they had created this endpoint for the purpose of demonstrating to the Sutagliflozin. And having set up first by telling investors that they had developed this endpoint with the FDA, then telling investors that the endpoint had the ability to balance this, and then finally telling investors that Sutagliflozin hadn't met this composite endpoint. They created in investors the impression that this endpoint was demonstrating that the better the ability to demonstrate that the benefits of Sutagliflozin outweighed its risks. But the FDA at a at the latest prior to those June 2018 statements had told them expressly that they didn't the FDA did not believe or had concerns that this endpoint did not provide or did not have the ability to demonstrate what defendants were asserting that it demonstrated. Now the defendants say that based on other based on the cases we've cited and cases defendants cite we need to provide a precise document with a day and date. But that would require us to produce evidence and that is not the standard for a motion to dismiss. In addition defendants main case is materially different from the circumstances here. There it was a the court was considering statements made after a so-called 120 day letter. And the plaintiffs were asserting speculatively that that 120 day letter had contained some unspecified concerns about certain elements of clinical trials. They had no evidence that these concerns were expressed in the 120 day letter. They were just assuming that the letter contained those concerns. And the district court dismissed that complaint because there was just not enough there to show that the representations about the concerns were made before or after that 120 day letter and thus before or after defendants had made certain representations. In this case the FDA itself has said we expressed these concerns in pre-submission meetings. And we know at a minimum that those meetings were at least occurring in the summer of 2017 because on pages R1727 and R1768 of the record defendants say we are meeting with the FDA to discuss our new drug application. In addition defendants had said prior to the class period that they had discussed this endpoint with defendants. And finally we know that the FDA said that they issued this warning before the NDA was submitted. Thus we know unlike HOE v. INSMED we know what context the warning was given. We know the substance of the warning and we know that the warning was given prior to defendants making statements about the composite endpoint. So we would submit that this is fundamentally different from defendant's core case HOE v. INSMED where the court dismissed not because they didn't have a day and date but because it was speculative as whether the warning was given prior to the defendant's statements. And here the warning we know based on the FDA's own statements the warning was given prior to at least a minimum of two statements by defendants. The second set of claims that we bring are alleging that defendants misrepresented the type of DKA diabetic ketoacidosis that was as slight low and manageable when defendants own investigators knew that the DKA was more serious, difficult to diagnose, and difficult to manage. Defendants and the district court argued and held respectively that we had not alleged any facts to demonstrate that these incidences of DKA were more severe, more difficult to diagnose, and difficult to and harder to manage. But these were based on statements by defendants own representatives at the advisory committee meeting describing events that had occurred prior to the advisory committee meeting. So defendants admitted at the advisory committee meeting that their own investigators had identified incidences of DKA that were more severe and defendants cannot point to any disclosure where they identify the severity of DKA. And severity, it's important to note, is different from seriousness. Seriousness has to do with the context of a clinical trial, whether it requires a medical intervention, a hospitalization, and so on. Severity has to do with blood levels of certain components associated with diabetes, and that is set by the American saying that it's severe and the failure to disclose severity when defendants had primed the market in saying that it was important for us, the FDA is focused on DKA and it's important for us to show a reduction or to show that the DKA is manageable by not disclosing that it was more severe, harder to manage, and harder to diagnose. They misled investors as to the nature of the DKA, the most important thing investors were thinking of as they were, as the phase three trials were developing. The third set of misrepresentations that we assert defendants have made relate to the risk management program. Defendants had primed the market from the start of the class period that it was going to be essential for them to show that they had a program that could manage the incidence of DKA effectively, and they did not have one. Defendants dispute whether the rate of DKA, whether number one, they admitted that the rate of DKA was decreasing during the phase, or whether the DKA, the rate of DKA had changed at all during the, during the phase three trials after they implemented the risk management program. But we have identified three points, at least, in the, in the transcript of the advisory committee meeting where defendants effectively concede that there was no change in the risk, the rate, I'm sorry, the rate of DKA during trials. And you can find them, those three instances at pages 1473, 1474, and 1476 of the test. Or that the endpoint, the risk management program was not an endpoint of the phase three trials. But that is making an inference in defendants favor. When in reality, what was happening was the, the advisory committee members were saying to defendants, you have just shown us that the rate of DKA did not increase, did not decrease after you implemented your risk management protocols. And rather than saying no, or that's not true, or that conflict, so that's just your interpretation, defendants then simply dissembled, or defendants expert, I should say, not defendants themselves, defendants expert, Dr. Jensen, dissembled and said, that's, we don't know one way or the other because we weren't testing for it. That is an effective acknowledgement, especially when you note that in the minutes, this is at page 2528 of the record, in the minutes, the advisory committee concludes that there is no evidence that the risk management program had any effect on DKA. Now, for Scienter, we allege that defendants had knowledge of these, of these negative facts, or these adverse facts, and at the minimum, recklessly failed to disclose them based on the nature of their statements, because the FDA said that it had communicated the warning, because it was defendants' own investigators who had drawn conclusions about the types of DKA that were being experienced. And finally, the defendants' own investigators had identified whether or not the DKA was increasing, the rate of DKA was increasing, decreasing, or unaffected. Do you contend that the defendants communicated anything to the investors contrary to this, these negative, so-called negative factors? Yes. We, when, with regard to the composite endpoint, they communicated to investors that they had developed the composite endpoint to weigh the benefits and risks of the drug and then of cetagliflozin, and then said that by fulfilling this clinical endpoint, it demonstrates the superiority of cetagliflozin. That is misleading if the, by fulfilling that endpoint, the endpoint doesn't communicate what it's designed to communicate, which is that the benefits of cetagliflozin outweigh its risks. At the same time, when they characterized DKA as slight, manageable, and low, they were telling investors that the DKA they were seeing in the trials was not anything to be concerned about because it was so sporadic. And in fact, they, at the times they were disclosing these rates of DKA, they were telling investors, it's the context of the DKA that matters, not the incidence of the DKA, which is exactly the type of representation the FDA had warned them not to make. But when you consider in totality, as the court must, all of the statements defendants were making, communicating slight, low, and manageable was misleading because the and more dangerous. They were difficult to identify, which may put patients at greater risk, and they weren't, they weren't responsive to management programs. And then finally, by telling investors that we absolutely need to have a risk management program, and we're going to be in position with our risk management program, and then that to go in and have no risk management program that has absolutely no effect on the rate of DKA, and defendants know it, that is, prior statements had created a perception of facts or circumstances on the ground that were directly contrary to what was in reality. And that is a core falsity, that's a core representation or demonstration of falsity. And in the last two minutes I have before I, before I need to yield, defendants put their focus, their opposition to our arguments concerning Cyanter on a case involving AstraZeneca. And that case also, like the Hobie case, is distinguishable because in AstraZeneca, the court first acknowledged that being reckless with disregard to adverse facts is evidence of Cyanter. It then said that there were no red flags, and that because the EU had approved the drug in that case, that was enough for defendants to at least be, to have had a reasonable basis and not to have intent, along with the fact that they submitted a very long set of briefing documents. Here, there were numerous red flags. The FDA had warned about the composite endpoint. Defendants knew it was severe, difficult to diagnose, and resistant to manage. And importantly, the EU approval did not occur before the NDA as it had in, or before the representations in any event, as it had in AstraZeneca. It occurred after the alleged misrep, here it occurred after the misrepresentations. So at the time defendants were making their to be meritorious, or that its benefits outweighed its risks. And as your honors very well know, it's the facts in place at the time the statement is made, not facts later that are probative of Cyanter. Finally, in AstraZeneca, the court said that there was no evidence or no allegations that defendants did not believe what they were saying about the drug. Here, we have a confidential witness who says that during rehearsal meetings for the presentation to the advisory committee, executives were extremely unhappy with the way the presentations were going and appeared to believe that this drug was, I believe the exact words is, this is going to hell. This is not going to work. That is an allegation that was absent from AstraZeneca that shows that defendants did not believe the statements they were making about cetaglifosin. And with, unless your honors have further questions, I'll save my remainder for rebuttal. Thank you, sir. You'll have four minutes on rebuttal. Mr. Bissett. We can't hear you. Your sound is... Good afternoon, your honors. Paul Bissett, King & Spalding on behalf of the accolades. This case is yet another example of what's called event-driven securities litigation against a pharmaceutical company. The company seeks regulatory approval to market and sell a drug in the United States. The FDA denies approval, the company's stock price drops, and the plaintiff's lawyers pounce. They argue with 20-20 hindsight that additional or different disclosures should have been made. But Rule 9B and the PSLRA were designed to prevent this sort of litigation abuse. They require particularized factual allegations to support a claim of fraud. Those are missing here. What is here is plaintiff's attempt to mischaracterize what is good faith scientific dispute into securities fraud. Their case is based on the advisory committee meeting made up of 16 scientists and extensive briefing documents by the FDA and Sanofi and Lexicon as the sponsors of SOTA. And I'll use the short-term SOTA to make it easier. But scientists often do and did here disagree on the science and the clinical results and how to interpret those results. That is how science is supposed to work. That's what you want. And how do we know this was a reasonable good faith dispute? Because it was such a close call. Of those 16 advisory committee members, they split down the middle, eight to eight, as to whether the benefits or risks of SOTA being approved would fall. And as we know, the FDA denied approval, but the European regulator granted approval. The bottom line here is that all of the clinical data and trial results from not two, but three phase three trials were disclosed publicly. Nothing was hidden from the scientists and nothing was hidden from the investors. The district court examined this extensive complaint, 87 or so pages, 252 paragraphs. Several months after that, the court issued a 114 page opinion with no less than 208 footnotes, a very detailed, thorough opinion. And he analyzed the record, which is the advisory committee transcript, all the briefing documents, all the other documents that were before the court appropriately on the motion to dismiss. And he ruled in large part, plaintiff's allegations were contradicted by, or not supported by, the record. And in particular, he found no strong inference of CENTER, no false statements or omissions, and no loss causation. And this court should affirm that decision. With respect to CENTER, the court found that there was a lack of a strong inference. And we know, you know, from the briefing that we have two individual defendants and the plaintiffs make no attempt to differentiate between them. There are no motives offered, no stock sales by the company or insiders. And in fact, we know that the case law in this circuit is clear that a failure to capitalize on an alleged fraud actually negates an inference of CENTER. The court found that there was the most plausible inference was this good faith dispute amongst scientists. And he found that because of the extensive disclosures of SOTA's risks throughout the class period, the company fully disclosed the trials, the methodology, the data points, the end points, and the results, and repeatedly warned investors that the FDA may not approve SOTA. This was the allegedly hidden risk, and it was plainly disclosed multiple times by the company. And the court found, importantly, that there was no misstatement of existing facts or failure to disclose contradictory facts. So let's turn to the composite end point in terms of falsity. Because CENTER, by the way, is an independent ground to just to affirm the dismissal, and I don't think that's a close call here. As to falsity, let me explain. Counsel used the word warning several times. That is not anywhere in the briefing documents, or the transcript, or the complaint for that matter. What they say is an FDA briefer said during the meeting that at pre-submission meetings, the FDA expressed concern about the utility of this composite end point, which, by the way, was only in the third trial. And they expressed concern whether it will be adequate to assess and characterize the overall benefit-risk profile of SOTA. What does that show? And if you look at the transcript and read it, which Judge Lake did, it's very clear in context what that was, was a dispute that reasonable scientists often have as to diabetes adjuncts like SOTA. Those members at the meeting, and it's in the transcript, discussed at length the difficulty of crafting any end point that would be appropriate to weigh the benefits and risks of an adjunct like SOTA. It was clear when you read the transcripts, again, in context, there was no consensus among those 16 scientists about a better approach than the composite end point. Plaintiffs even acknowledge that one of the members admitted, we don't as a community in diabetes have particularly good outcome measures. So, in context, there was no warning. There was a concern amongst the FDA and other scientists that diabetes testing for adjuncts like SOTA is difficult. They don't have clean metrics. That's scientific debate. That's not a basis for a fraud claim. And you can see that because there's no specificity about the claim. We don't know who at the FDA said what to whom, when, and in what context. There's not enough detail there. I mean, the case law is clear that that does not support a claim for fraud. And in fact, you can actually see what plaintiffs are doing to some extent because the record is so extensive. They point to a statement by a defendant Laporta that he made at the ADCOMM committee meeting. And this is, and they cite record number 1236, that page, to show that the FDA did express concerns to him. Well, if you go to that page and read what he said, he said that Lexicon developed the phase three end points in consultation with FDA. This undermines the whole fraud case. Let me move on to the DKA. Again, they claim that Lexicon misstated or omitted the heightened risk of DKA. That's not true at all. And you can find extensive disclosures in the record, correctly and repeatedly disclosed by the company, widely reported on by analysts and industry publications. Council talked about, well, we characterize the incidence of DKA as low or moderate. Well, all the data was there, and it ranged from 2.9% to 3.8%, which under any characterization is low. And, but all the data was there. Again, a dispute over characterization when there's no dispute over the underlying data being accurate and disclosed does not give rise to a fraud claim. Moreover, in the briefing, he talked about, they talked about the fold increases over placebo were not disclosed. But again, unlike a medicines or any other case, it was easily calculated. And that's what Judge Lake found. No content is missing in the data that was fully and accurately disclosed. Moreover, they did it. They disclosed all this data at or near the time the data came out with respect to those three trials. So it wasn't just at the ADCOM meeting. What I mean is the New England Journal of Medicine published the full results, all of the data of the third in tandem three trial in 2017. In tandem one and two trials, fully disclosed data in the diabetes care publications in 2018. All DKA incidences in the treatment and placebo arms, the number of serious DKA incidences, all of it is there. In fact, anyone could have calculated their main claim, which is, well, 68% of DKA incidences were severe, but that's easily discerned from the data that was fully disclosed in 2017 and 2018. Nothing, as I said before, was hidden. They can't point to it. It's there in the data. I think the dispute comes down to, did we, did the company and the defendants characterize the data the way they would like? That is not a basis for a fraud claim. The risk management profile they talked about is probably the easiest one to dismiss here. The company said, and what the court, the district court found was plaintiff's allegations with respect to the risk management profile were contradicted by the transcript of the advisory committee meeting. There was a plan at record 2950 and 51. It's very clear what the risk management plan was, but the company disclosed that the phase three trials were not designed to study the impact of the risk management profile or protocol rather, but it was there. The protocol was listed, but the study design wasn't designed to actually see what the effect would be, but the company fully disclosed the risk management protocol is going to be important. Here it is. Investors could assess for themselves what they thought about the profile or the protocol, excuse me. It warned investors that one of the key issues for FDA approval would be their view of the risk management protocol. Flexicon's expert acknowledged that that risk management protocol was not tested in the trials. That was built that way, but it was fully disclosed that that would be the case. Then I want to hit something counsel said, because again, just like the district court found, their allegations are constantly contradicted by the record. For example, even though the risk management protocol wasn't testing and designed to be tested by the trials, the observed data shows that the mean rate of D. K. A. After implementation of the risk management protocols was lower than it was before. Again, in the Santa Fe briefing document record at 11 50 before March 31 of 2016, the mean rate of D. K. A. Was 5.6 after April 1 of 2016 when the risk management protocol measures were put in place, the mean rate dropped to 3.5%. That's in the observed data. Finally, I want to talk about loss causation because again, that's a very easy one. To affirm dismissal. Plaintiffs failed to address the district court's finding that the first amendment complaint didn't allege that the alleged misrepresentation caused stock price inflation. They didn't dispute that. That's thus deemed admitted and suffices by itself to affirm the dismissal and loss causation grounds. But more importantly, there were no corrective disclosures here. The stock price drops were caused by the publication of the advisory committee deadlocked 88 that the FDA denied approval of soda and that Santa Fe then terminated the collaboration agreement. Those are business results. The securities laws aren't designed to protect and ensure against market losses for bad business results. You have to have a corrective disclosure that brings to light previously withheld information or false information fed to the market. They don't have that here. What we have and we can show that because the data I just walked you through that was published in 2017 and 2018 showed all the things that the planners are talking about. D. K. A. Incidences, the severity, the seriousness, the risk management protocol wasn't going to be tested in the face three trials. All of that was disclosed, and we know from this circuit's authority in crossroads in green among others that information, the release of information that was already in the public domain cannot cause a stock price drop. So what caused the drop? The bad business results I just went through, which the court found to be the case, that's not loss causation. Finally, I should address the court's determination not to grant leave to amend. As I mentioned, the court fully analyzed the lengthy First Amendment complaint, reviewed the thousands of pages of exhibits, authored an extensive opinion, detailed, longer than the complaint itself, with almost as many footnotes as there were paragraphs in the First Amendment complaint. Case law, we know, on repleting does weigh in favor of letting plaintiffs amend, and that's usually what happens. But there are limits, and the district court acknowledged that plaintiffs are usually, but not always, allowed to replete and still decided not to grant. Leave to amend. Why? Because it would be futile. The whole construct of this case is to take scientific debate and turn it into securities fraud. We know from this circuit's authority in St. Luke's Episcopal Hospital, the 2004 opinion, that it's appropriate to not grant leave to amend where exhibits refute plaintiff's allegations. That's what Judge Lake found. And we know district courts are afforded a lot of deference on leave to amend. The plaintiffs didn't there below and haven't here on appeal provided any detail on what they could allege that would cure the deficiencies, that would counter what is in the record. They can't make conclusions about, well, we can allege additional FDA meetings, or we can allege more DKA incidences. That doesn't do anything. There's no specificity. There's no indication that they could allege anything to counter what is in the public record, what is in the documents, what was appropriately considered by Judge Lake. In other words, what they have shown, it would still be futile to amend. And that was the basis upon which the court denied leave to amend. That was not an abuse of discretion. The court used existing legal framework and considerations. And because of the essentially construct of this case, which is to turn good faith scientific debate into securities fraud, the court said, no, there's nothing here that I've seen, nothing that you have provided me that would change my view. And we submit that is not an abuse of discretion. If the court has no further questions, I will submit on that basis. Thank you. Thank you, your honors. Briefly, I want to challenge a few of Mr. Bassett's assertions. First, this is not an issue of a scientific debate. This is an issue of defendants concealing information that was material and that they had a duty to disclose that they did not disclose. And the reason why we know this is that there was no disclosure whatsoever of what the FDA said about the composite endpoint. Now, Mr. Bassett may want to say that the FDA said we had concerns as opposed to we warned. But this composite endpoint was the centerpiece of the phase three trials. Mr. Bassett says that it was an endpoint in only one trial. That's false. It was an endpoint in all three trials. And it was the only endpoint that purported to balance the benefits and risks of sotagliflozin, which investors had been told repeatedly would be what the approval of this drug hinged on. So the idea that we're somehow saying that this is a debate over what the endpoint did and didn't do, that's wrong. It was the centerpiece. And all of the committee members said that it was not helpful in weighing the benefits and risks, and no committee member defended that endpoint. There was one committee member who said something about how, well, we don't really have any good endpoints. But that's not a defense of telling investors that you have an endpoint that balances the benefits and risks when you have been told that it doesn't do that. Secondly, Mr. Bassett is incorrect that severity, difficulty predicting, and difficulty management were disclosed. They were not. In those New England Journal of Medicine articles, and you can find them in the record at 1818 to 29, 1831 to 41, and 1843 to 52, I defy Mr. Bassett to find one mention of severity of DKA. The information is not there. And on top of that, there is no mention of how patients have fewer warning signs about the DKA, or that the rate of it changed before or after the risk management protocols were implemented, or that defendants had no ability to identify a class of patients more at risk for DKA. That is not there. The assertion that defendants fully disclosed everything is categorically incorrect. The risk management program, at best, there is a dispute of material fact, because while Mr. Bassett's correct that defendants experts did assert that, no, the mean rate of DKA declined, defendants expert did not repeat that assertion when he was challenged repeatedly over the fact that the rate of DKA was not affected, and the advisory committee again concluded unanimously that there was no evidence that the risk management program had any effect. That was a fact that defendants knew because their experts were the ones tallying the rate of DKA, and the FDA was basing its results, or basing its presentation on exactly what defendants had given it. The suggestion that, at best, there's just a dispute of fact. When it comes to CYENTR, we disagree that this is an easy case. This is a small company with basically one product that had the ability to return it to profitability, and although it had a second product, that product's sales were minuscule compared to what it needed to produce, and it's just inconceivable that defendants did not know the facts that they are alleged to have disclosed, and that is sufficient to prove CYENTR in this case. And finally, for loss causation, generic disclosures of risk, it is well established, are not sufficient to put on notice of the specific misrepresentations that were made here, and we plainly allege that it was the misrepresentations, not the 8-8 deadlock, that caused defendants' losses. Thank you. Thank you, gentlemen, for your excellent arguments. They'll be taken under advisement, and we'll issue an opinion as soon as we can. Thank you, your honors.